**UNIVERSAL CITY STUDIOS, INC., et al., Plaintiffs,**

v.

**Shawn C. REIMERDES, et al., Defendants.**

**No. 00 CIV. 0277(LAK).**

United States District Court, S.D. New York.

July 17, 2000.

Order on Reconsideration July 19, 2000.

Leon P. Gold, Jon Baumgarten, Charles Sims, Proskauer Rose LLP, New York, NY, for Plaintiffs.

Martin Garbus, Edward Hernstadt, David Atlas, Frankfurt, Garbus, Klein & Selz, P.C., New York, NY, for Defendants.

## OPINION

KAPLAN, District Judge.

This is an action by major motion picture studios against Eric Corley and 2600 Enterprises, Inc.[1] under the Digital Millenium Copyright Act ("DMCA").[2] Plaintiffs in substance claim that the defendants threaten to post a software program known as DeCSS on their Internet web sites. As the function of DeCSS allegedly is to circumvent the encryption software that protects plaintiffs' copyrighted movies that are distributed on digital versatile discs ("DVDs"), it is plaintiffs' position that defendants' dissemination of DeCSS via the Internet (or otherwise) would constitute trafficking in means of circumvention of the technology that controls access to their copyrighted works and therefore violate the DMCA. They seek injunctive relief.[3]

In January of this year, the Court granted plaintiffs' motion for a preliminary injunction.[4] In May, after defendants moved to vacate and plaintiffs to expand the preliminary injunction, the case was set for trial on July 17. Defendants repeatedly and unsuccessfully have sought postponements. Following the denial on July 10 of their most recent application,[5] defendants moved to recuse the undersigned as the judge in the case.

1. Two other defendants have settled with plaintiffs.

2. 17 U.S.C. § 1201 *et seq.*

3. Although defendants' memorandum states that they seek damages (Def.Mem.3), the amended complaint dropped the damage claim.

In considering the motion, the Court has borne in mind its duty to disqualify in any case in which its impartiality reasonably might be questioned. It has been mindful also of the admonition of Congress which, in passing the current version of one of the relevant recusal statutes, said this:

"[I]n assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are in fact seeking to avoid the consequences of his expected adverse decision. Disqualification for lack of impartiality must have a *reasonable* basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a 'reasonable fear' that the judge will not be impartial. Litigants ought not to have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice."[6]

### I

As one of the bases of defendants' motion turns on the relationship, if any, between the issues in this case and an alleged prior representation of one of the plaintiffs (or a predecessor in interest) by a former law partner of the undersigned, it is useful to set out with some care the nature of this case and the issues before the Court. Further, an understanding of the place and timing of the recusal motion in the broader context of the litigation may be helpful, particularly in light of defendants' belated claim that they have been treated unfairly in the lawsuit.

4. *Universal City Studios, Inc. v. Reimerdes*, 82 F.Supp.2d 211 (S.D.N.Y.2000) (hereinafter *"Universal I"*).

5. Order. July 10, 2000 (Docket Item ["DI"] 125).

6. H.R. REP. No. 93–1453, 93d Cong., 2d Sess., *reprinted in* 3 U.S.C.C.A.N. 6351, 6353 (1974) (emphasis in original).

## A. The Background of the Litigation

DVDs are five-inch wide discs that, in this application, hold full-length motion pictures. They are the latest technology for private home viewing of recorded motion pictures. This technology drastically improves, as compared with video tape, the clarity and overall quality of a motion picture shown on a television or computer screen.

DVDs contain motion pictures in digital form, which presents an enhanced risk of unauthorized reproduction and distribution because digital copies made from DVDs do not degrade from generation to generation. Concerned about this risk, motion picture companies, including plaintiffs, insisted upon the development of an access control and copy prevention system to inhibit the unauthorized reproduction and distribution of motion pictures before they released films in the DVD format. The means now in use, Content Scramble System or CSS, is an encryption-based security and authentication system that requires the use of a DVD player or a computer DVD drive that contains the technology needed to decrypt, unscramble and play back CSS-protected motion pictures on DVDs. DVD player manufacturers therefore must license the necessary technology from an appropriate source, now the DVD Copy Control Association ("DVD CCA").[7]

The chronology of the introduction of DVDs and CSS is relevant to this motion. The predecessor of the DVD CCA first began licensing the necessary CSS technology to DVD player manufacturers on or about October 31, 1996,[8] the same year in which DVD movies first were introduced in the United States.[9] Since then, CSS has facilitated enormous growth in the use of DVDs for the distribution of copyright-ed movies to consumers. As of earlier this year, over 4,000 motion pictures had been released in that format in the United States, and movies were being issued on DVDs at the rate of over 40 new titles per month in addition to rereleases of classic films. More than 5 million DVD players had been sold, and DVD disc sales then exceeded one million units per week.

During this period, the motion picture industry and other related constituencies evidently were concerned that hackers and intellectual property pirates would develop means to circumvent CSS and other means of controlling access to copyrighted materials. In October 1998, Congress responded by enacting the DMCA which, among other things, proscribes the provision of means of circumventing technology that effectively controls access to copyrighted works.[10]

In October 1999, an individual or group, believed to be in Europe, managed to "hack" CSS[11] and began offering, via the Internet, a software utility called DeCSS that enables users to break the CSS copy protection system, thus allegedly facilitating the making and distribution of digital copies of DVD movies. Defendants operate an Internet web site known as 2600.com. At the time this action began in January 2000, the site posted DeCSS and made it available to any visitors who wished to download it.

## B. Prior Proceedings

This action was commenced on January 14, 2000. On January 18, the Court signed an order to show cause bringing on plaintiffs' motion for a preliminary injunction. Defendants submitted a memorandum in opposition to the motion, but no affidavits or other evidentiary material. The Court

---

7. Attaway Decl. ¶¶ 4, 5, 9 (DI 4).

8. Hoy Decl. (DI 92), ¶ 3.

9. Attaway Decl. (DI 4), ¶ 6.

10. 17 U.S.C. § 1201(a)(2).

11. Reports indicate that Norwegian police arrested an individual said first to have hacked CSS. *See* Mike Godwin, *Teen Co–Creator of DVD Decryption Program Arrested at Norwegian Home,* E-COMMERCE LAW WEEKLY, Feb. 2, 2000.

granted the motion from the bench on January 20, 2000, enjoining defendants from posting DeCSS on their web sites pending final resolution of this action.[12] Mindful of the First Amendment implications of the order, however, the Court noted defendants' interest in minimizing the duration of the preliminary injunction and offered a substantially immediate trial.[13] Defendants declined. Indeed, the case was virtually inactive for the ensuing two months, although defendants in February or March retained their present counsel.[14]

### 1. The Original Trial Setting

On March 20, 2000, the Court held a routine scheduling conference at which defendants' present counsel appeared before it for the first time. Plaintiffs stated their willingness to go to trial immediately. Defendants, however, indicated a desire to conduct discovery to develop a full factual record. In consequence, the Court entered a scheduling order calling for the completion of discovery by October 20, 2000 and a trial starting on December 5, 2000. As far as the record discloses, defendants first began to seek discovery on April 3, 2000, when they served notices of deposition.[15]

### 2. Early Motion Practice

On April 5, 2000, plaintiffs moved to modify the preliminary injunction to re-strain defendants not only from making DeCSS available on their web sites, but from linking to other web sites on which the program remains available.[16] Three weeks later, plaintiff Time Warner moved to disqualify defendants' new counsel, Martin Garbus and the firm of Frankfurt, Garbus, Klein & Selz, P.C., on the ground that the Frankfurt firm simultaneously was representing Time Warner in another action. And on May 2, 2000, defendants cross-moved to vacate the preliminary injunction. These filings appear to have led to a breakdown in cooperation among counsel and to have precipitated a good deal of difficulty with discovery.[17]

On April 28, plaintiffs asked to stay all discovery in the action pending resolution of their motion to disqualify defendants' counsel or, alternatively, to adjust the deposition schedule. The Court denied the motion to stay discovery generally, stayed discovery against Time Warner pending resolution of the disqualification motion, and advised the parties to proceed with discovery.[18] But this proved to be only the opening gun of the discovery contention.

### 3. Defendants' Sanctions Motion and the Advancement of the Trial

On May 8, defendants' counsel moved for discovery sanctions and other relief, accusing plaintiffs of sundry discovery misconduct.[19] During the course of the argu-

---

**12.** The Court subsequently issued a memorandum opinion. *Universal I*, 82 F.Supp.2d 211.

**13.** Tr., Jan. 20, 2000 (DI 17), at 79–80.

**14.** The date is uncertain, as counsel has given inconsistent accounts of when he was retained in this action. *See* Tr., May 2, 2000 (DI 122), at 14 (stating that he was retained two and a half months earlier, i.e., in mid-February 2000); Tr., June 27, 2000 (DI ___), at 18 (claiming that he was retained on or about March 19, 2000).

**15.** They first served Rule 34 document requests later in April.

**16.** Plaintiffs had made such a request orally at the preliminary injunction hearing but the Court declined to entertain the request at that time subject to the plaintiffs' right to make the application in the form of a motion to modify. Tr., Jan. 20, 2000 (DI 17), at 81–85.

**17.** Counsel at this point routinely accuse one and other of misrepresenting facts to the Court and of name-calling. Letter, E. Hernstadt to L. Gold, May 25, 2000, Ex. (attached to DI 137); Letter, L. Gold to Court, June 6, 2000 (DI 140); Letter, C. Sims to Court, July 11, 2000 (DI 159); Letter, E. Hernstadt to Court, June 22, 2000 (DI 143); Letter, M. Garbus to Court, July 11, 2000 (DI 164).

**18.** Tr., May 2, 2000 (DI 122), at 21–24.

**19.** The motion ultimately was denied as groundless. *Universal City Studios, Inc. v. Corley*, No. 00 Civ. 0277(LAK), 2000 WL

ment of defendants' motion, plaintiffs raised the possibility of advancing the trial and consolidating it pursuant to Rule 65(a)(2) with any evidentiary hearing that might be required on defendants' motion to vacate the preliminary injunction. In the course of that discussion, the defendants indicated that they wished to keep the December 2000 trial date or, at most, advance the trial to October 2000. They indicated also that they wanted a prompt decision on the motion to vacate the preliminary injunction and, if unsuccessful on that motion on a limited record, would continue to make motions to vacate on the developing record throughout the litigation.[20] This discussion, moreover, came on the heels of defendants' insistence on May 2, 2000 that they needed the outstanding discovery for purposes of the pending motion to vacate,[21] a proposition that could be squared with their desire for a prompt ruling on the motion only if they contemplated a repeated application if the first were unsuccessful. Thus, the plaintiffs and the Court were faced with a real risk of repeated applications to vacate the preliminary injunction prior to an October or December 2000 trial. Moreover, although given ample opportunity to explain why defendants–who took no appeal from the preliminary injunction and did not even begin discovery until almost three months after this action was filed–required so many months for discovery, defendants failed to do so. Indeed, Mr. Garbus told the Court that he probably needed only five depositions, or perhaps two weeks of testimony, to be ready for trial, although he quickly abandoned that position when the subject changed to the possibility of an early trial date.[22] Accordingly, by order dated May 12, 2000, the Court advanced the trial of the action to July 17, 2000 and stated that it would hear the motions to vacate and to expand the preliminary injunction at that time in the event they required the taking of evidence. The Court noted that, while the case raises significant issues, the factual issues appeared to be relatively few, that the case could be prepared for a plenary trial on this schedule, "especially given the abilities of the attorneys ... involved in the case," and that advancement of the trial would permit a final decision on a full record rather than an interlocutory ruling or rulings on one or, worse yet, a series of motions to vacate the preliminary injunction, each on a somewhat more expanded record than the one that preceded it.[23] It observed also that the prospect of a prompt trial should give both sides "an added incentive to stop needless bickering and posturing and get on with the business at hand." [24]

Subsequent to the advancement of the trial, the Court denied the motion to disqualify Mr. Garbus and his firm. The Court recognized that the taking on of cases both for and against Time Warner at the same time had been an accident.[25] Although it was critical of the firm's refusal to withdraw from this action once it became aware that Mr. Garbus' partner simultaneously was representing Time Warner, which here is suing Mr. Garbus' clients, in another action, the Court denied disqualification on the grounds that Time Warner appeared to have made the motion for tactical reasons, that disqualification would prejudice defendants unduly in light of the expedited schedule, and that issues of professional misconduct could be dealt

621120,*7 (S.D.N.Y. May 12, 2000) (hereinafter "Universal II").

**20.** Tr., May 11, 2000 (DI 126), at 14–16, 39.

**21.** Tr., May 2, 2000 (DI 122), at 8–9.

**22.** Tr., May 11, 2000 (DI 126), at 11–12, 22–24, 26.

**23.** *Universal II*, 2000 WL 621120, at *6.

**24.** *Id.* The order provided also for expedited discovery.

**25.** *Universal City Studios, Inc. v. Reimerdes*, 98 F.Supp.2d 449, 455 (S.D.N.Y.2000) (hereinafter "Universal III").

with in other *fora*.[26] In making the latter observation, the Court did not more than repeat what the Second Circuit has said more than once[27]–claims of ethical violations by lawyers should be resolved in professional disciplinary bodies rather than on motions to disqualify counsel absent a real threat of trial taint.

### 4. Subsequent Discovery and Defendants' Efforts to Delay the Trial

#### a. The Explosion of Defendants' Discovery Demands

Defendants' obviously were unhappy about the advancement of the trial date. On May 11, they stated that they wanted the motion to vacate the preliminary injunction decided immediately[28] and that they did "not anticipate making any further substantive motion regarding the preliminary injunction until discovery closed."[29] This appears to have been a response to the Court's concerns about repeated motions to vacate. But it left open the possibility that there would be

two motions to vacate, even assuming that defendants' anticipation proved accurate.

Defendants' May 11 prediction that they could be ready for trial with as few as five depositions proved short-lived. By May 22, they had noticed 28 depositions, of which 12 were noticed following the advancement of the trial and 7 more on or after May 11, the date on which the Court indicated that it would consider advancing it.[30] And by May 29, the list had grown to 35 witnesses.[31]

#### b. The June 8 Adjournment Request

In early June, defendants applied to adjourn the trial, complaining that much discovery remained to be done.[32] The Court held a conference with counsel and explored that contention. At the conference, however, defendants' counsel–in stark contrast to the list of 35 depositions, most as yet uncompleted, that they had offered just days before–said that defendants needed "eight to 10 depositions" and that the plaintiffs wanted approximately an

---

26. *Universal III*, 98 F.Supp.2d at 455–56.

27. *See, e.g., Armstrong v. McAlpin*, 625 F.2d 433, 446 (2d Cir.1980) ("However, absent a threat of taint to the trial, we continue to believe that possible ethical conflicts surfacing during a litigation are generally better addressed by the comprehensive disciplinary machinery of the state and federal bar.") (quotations omitted), *vacated on other grounds*, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981); *Board of Educ. of the City of New York v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir.1979) ("[U]nless an attorney's conduct tends to taint the underlying trial ... courts should be quite hesitant to disqualify an attorney.") (quotations omitted); *W.T. Grant Co. v. Haines*, 531 F.2d 671, 677 (2d Cir.1976) ("The business of the court is to dispose of litigation and not to act as a general overseer of the ethics of those who practice here unless the questioned behavior taints the trial of the cause before it. [Absent a showing of] taint ... [i]f [counsel] is guilty of professional misconduct ... the appropriate forum is the Grievance Committee of the bar association.") (quotations omitted).

28. The plaintiffs had not yet even responded to the motion and the time for doing so had not yet expired.

29. Letter, E. Hernstadt to Court, May 11, 2000 (DI 60).

30. Hernstadt Decl., June 27, 2000 (DI 116), Ex. B.

31. Letter, E. Hernstadt to L. Gold, May 25, 2000, Ex. (attached to DI 137).

 It should be noted that these lists (i.e., this one and that cited in the prior footnote) are inaccurate in at least one respect as to whether the depositions had occurred. Defendants noticed depositions of each of the plaintiffs pursuant to Rule 30(b)(6), which permitted defendants to designate witnesses to appear on behalves. They all designated Messsrs. Schumann and Jacobsen, as was their right, and defendants deposed them. Tr., May 11, 2000 (DI 126), at 20–21, 27; Letter, L. Gold to Court, June 6, 2000 (DI 140), at 2; Letter, S. Cooper to Court, May 31, 2000 (DI 138). Defendants nevertheless have continued to claim that they have not been permitted to conduct the depositions of at least some of the plaintiffs. *E.g.*, Letter, M. Garbus to Court, June 6, 2000 (DI 141).

32. Letter, E. Hernstadt to Court, June 8, 2000 (DI 142).

equal number.[33] Defendants complained also that there were unresolved privilege issues.

Plaintiffs responded that the only depositions they wished to conduct were of the defendants and any witnesses whom the defendants proposed to call at trial, or probably a total of 6 to 8 witnesses.[34] Both counsel reported their agreement to exchange witness lists by June 19,[35] which of course offered the possibility of reducing the number of depositions that plaintiffs would seek.

The Court then asked defendants' counsel to identify the remaining witnesses they wished to depose. Counsel responded that they intended to depose at least six witnesses[36] and possibly as many as 13, depending on the testimony by the six.[37] The Court then pressed counsel as to the factual issues as to which these witnesses could give relevant testimony, explicitly questioning the need for all of this discovery in light of the narrow factual issues in the case.[38] After hearing defendants' counsel, the Court stated that it was "not today prepared to alter the schedule," but indicated that all would "see how it goes."[39]

### c. The June 23 Adjournment Request

On June 23, 2000, defendants again applied for an adjournment of the trial. They argued that they still had not commenced 7 or completed 1 of a total of 8 "crucial" depositions, that plaintiffs would take approximately 8 to 10 depositions and that other discovery issues remained.[40] Plaintiffs responded that "defendants' discovery plan and conduct have been calculated to ensure that discovery *could not* be completed in the time required by the Court's scheduling order," that they were "requesting information far beyond the bounds of anything arguably relevant to legitimate defenses to plaintiffs' claims, and directed at documents largely created by attorneys," and that defendants repeatedly had deferred depositions and refused to make witnesses available.[41] They pointed out that only one deposition had been conducted between June 8 and June 26.[42] Plaintiffs reiterated that they would not depose anyone whom defendants did not intend to call at trial, but reported that defendants thus far had committed to producing only defendant Corley and one other witness for examination before the July 5 discovery cutoff.[43]

The Court conducted a conference with counsel on June 27, 2000 concerning defendants' June 23 request for an adjournment and a dispute over whether defendants would be permitted to depose Michael Eisner, chief executive officer of Disney. After hearing the parties, the Court rendered a bench opinion (a) rejecting plaintiffs' application to bar the deposition of Mr. Eisner, but limiting the duration of the deposition absent a further .showing of need, (b) extending the discovery period through July 11, and (c) denying an adjournment.[44] In brief summary, however, the Court made the following points in respect of the application for an adjournment:

 1. The factual issues for trial are narrow and well defined.

---

33. Tr., June 8, 2000 (DI ___), at 3–5.

34. *Id.* at 9–10.

35. *Id.* at 10.

36. Litvak, Goeckner, Reider, Eisner, Hirsch and the DVD CCA.

37. Tr., June 8, 2000 (DI ___), at 10–11.

38. *Id.* at 11–25.

39. *Id.* at 25.

40. Letter, E. Hernstadt to Court, June 23, 2000 (DI 144).

41. Letter, L. Gold to Court, June 26, 2000 (DI 148).

42. *Id.*

43. Letter, C. Sims to Court, June 27, 2000 (DI 151).

44. Tr., June 27, 2000 (DI ____), at 33–50.

2. Defendants have relatively little need for discovery, and plaintiffs had sought little.

3. Rule 30(a)(2)(A) presumptively caps the number of depositions in a case at ten, and Rule 26 gives district courts broad authority to limit discovery, taking into account the needs of the case and other relevant factors.

4. The number of depositions sought in the case is unjustified.

5. To some degree, the insistence on discovery appears to have been driven by a desire to generate publicity and embarrass plaintiffs' executives. Defendants' deposition of Jack Valenti, president of the Motion Picture Association of America ("MPAA"),[45] consisted in substantial part of hypothetical questions, efforts to elicit legal opinions from a lay witness, and argumentative questioning. Defendants subsequently posted the deposition transcript on their web site. While they had a right to do so, the nature of the deposition and the fact of the posting support the view that the deposition was largely unnecessary and conducted as it was for purposes unrelated to the resolution of the factual issues in dispute in this action.

6. Defendants have not used the time available to them appropriately. They did nothing before Mr. Garbus was retained. Even after his retention, very little was done before the possibility of advancement of the trial arose on May 11.

7. Defendants' motion for discovery sanctions; which had been based on claims that plaintiffs had failed to comply with their discovery obligations, had been substantially groundless, thus casting doubt on defendants' protestations concerning plaintiffs' compliance with discovery requests.

8. Finally, the Court noted that defendants had been given every opportunity to demonstrate that they really needed additional discovery:

"They had the opportunity to come in here this afternoon and make a showing, witness by witness, of who these people were, what it is they want to question them about, why it is important or indispensable to preparing the case for trial."[46]

They still have not done so.

### d. The July 5 Adjournment Request

Defendants next applied to adjourn the trial on July 5, 2000.[47] This time they complained that plaintiffs suddenly had identified new witnesses, that 20 depositions remained to be taken, and that many documents remained to be reviewed.[48] Plaintiffs promptly responded by challenging the accuracy of defendants' assertions.[49] They contended that plaintiffs sought only six remaining depositions, many of which had been delayed by defendants' refusal to provide plaintiffs with their witness list earlier, that the remaining deponents sought by defendants had no information relevant to the case, and that the vast bulk of the documentary discovery conducted by defendants was of irrelevant material.[50] Once again, defendants had made no effort to show precisely why the allegedly uncompleted discovery was needed for the proper resolution of this case.

**45.** DI 163.

**46.** *Id.* at 47.

**47.** Letter, M. Garbus to Court, July 5, 2000 (DI 123).

**48.** *Id.*

**49.** Letter, L. Gold to Court, July 6, 2000 (DI 124).

**50.** *Id.*

In considering whether to afford more time for discovery, the Court considered a number of factors. It bore in mind the core issues in the case–the proper construction of the DMCA, which turns on matters including what DeCSS does, what its uses are, and to some extent the motives for defendants' actions, and the DMCA's constitutionality–and the relationship of the discovery defendants seek to the resolution of those issues. It took into account the parties' ability to obtain discovery adequate to permit a fully informed resolution of those issues, assuming an appropriate focus on the task at hand. It was mindful of the ever-changing contours of defendants' discovery program. It considered the fact that there is a preliminary injunction in place that defendants claim is inconsistent with the First Amendment.

The Court denied the application by order dated July 10, 2000.[51] The order stated in part:

"There has been no showing that defendants, despite due diligence on their part and an appropriate deployment of their resources, would be prejudiced in any definable way by adherence to the current trial schedule, of which they have been on notice for a substantial period of time. To whatever extent they find themselves under genuine time pressure, the problem is largely of their own making, as they have devoted effort to matters that may be of interest to those that visit their web site, but that have little or no utility in resolving the legal issues in dispute in this case."[52]

### 5. Document Discovery

This description of pretrial proceedings would not be complete without addressing defendants' complaints concerning the lateness and volume of plaintiffs' document production.

Defendants' document demands in this case were extremely broad. They have sought, for example, all documents relating to copying of DVDs (without limitation on means of copying) anywhere in the world,[53] all documents relating to CSS, including its creation and the creation of alternative security systems,[54] and all documents relating to any agreement "that in any way ... relates to" plaintiffs' plans for future DVD security systems,[55] to give but three examples. Defendants made these demands despite the fact that many documents relating to DVDs and to CSS, not to mention plaintiffs' future security plans, have little or nothing to do with the issues in this case. That it took some time to gather the documents and that there are many of them should come as no surprise. Had the requests been focused properly, there is no reason to suppose that any problem would have occurred.

### C. The Attempts to Remove the Trial Judge

Defendants' efforts to remove the trial judge began less than 24 hours after the denial of their final motion to postpone the trial.

### 1. July 11, 2000

Defendants' counsel on July 11, 2000 requested a telephone conference with the Court and opposing counsel. Mr. Garbus began the call by stating that he had two issues to raise. The first was his claim that he had learned from his colleagues that a witness had testified the preceding day that Paul, Weiss, the firm of which the undersigned was a member prior to his appointment to the bench in 1994, had represented Warner in 1993 "concerning DVDs" and that he understood that a Mr. Robinowitz and others had been involved.[56]

---

51. Order, July 10, 2000 (DI 125).

52. Id.

53. Miller Decl. (DI 56), Ex. C, ¶ 10.

54. Id. ¶ 17.

55. Id. ¶ 9.

56. Tr., July 11, 2000 (DI ____), at 2.

He stated that he had "no idea whether this Court was involved in rendering any of those legal opinions [the nature of which was not specified], some of which are apparently at issue here." He offered to have his colleagues address the subject "unless it is totally irrelevant."[57] The Court responded that it was irrelevant, and there was no further discussion of the issue during the conference call.

Counsel then turned to his second issue. He claimed that he had been told that morning of a conference that the Court allegedly had had with a lawyer at Paul, Weiss "concerning some of [counsel's] behavior."[58] The story, according to Mr. Garbus, was that the late Morris Abram, a former Paul, Weiss partner, had accused Mr. Garbus, in connection with a case called Black Watch, of going through "Abram's file during the lunch break" and of reading his private files.[59] The Court responded that it recalled "having heard that story, probably from Mr. Abram and probably 20 or more years ago, and [that], as far as [the Court is] concerned, it has no bearing on this matter."[60] Counsel pursued the matter, claiming that he later had discussed the matter with Morris Abram and that Mr. Abram told him that "people in his law firm thought he should have pursued a grievance application against" counsel. The Court advised counsel that it had no knowledge whatsoever about any grievance application, that it had had nothing to do with the case to which he referred, that it had no personal knowledge of the facts, and that it "certainly [was and is] not in any position to pass judgment on the truth of" the story.[61]

**2. *July 12, 2000***

The Court held the final pretrial conference in this matter, which had been scheduled on or about June 22, 2000, on July 12, 2000.[62] At the start of the conference, defense counsel handed up two affidavits, one of Martin Garbus and the other of his partner, Richard Kurnit.

*a. The Kurnit Affidavit*

Mr. Kurnit was an associate at the Paul, Weiss firm from 1976 until September 1981. He then joined the Frankfurt firm and long has been a partner there. The undersigned was an associate at Paul, Weiss from 1970 until October 1977 and a partner from October 1977 until August 22, 1994.

Mr. Kurnit's affidavit states that, in September 1981, he informed the undersigned of his decision to become an associate at the Frankfurt firm and that the undersigned then "advised [him] in substance that Morris Abram, another partner in the firm, had tried a case against Martin Garbus, and [that] . . . Garbus had improperly and secretly read Morris Abram's trial notes of the case on trial."[63] It then goes on to state that Mr. Kurnit "assumed" that the undersigned had been involved in the trial, although he might be wrong, that his "impression" was that the undersigned believed that Mr. Garbus had so acted, and that Mr. Kurnit's "understanding" was that the undersigned was "advising [him] of a serious ethical violation, improper conduct, and the character of one of the name partners of the firm I was joining."[64] Mr. Kurnit's affidavit does not indicate when he first conveyed any of this information to Mr. Garbus or others in his firm.

---

**57.** *Id.*

**58.** *Id.* at 2–3.

**59.** *Id.*

**60.** *Id.* at 4.

**61.** *Id.* at 5.

**62.** In substantial measure, the purpose of the conference was thwarted by the failure of defendants' counsel to comply with the Court's June 22 order, which required the submission of witness and exhibit lists by July 10. Order, June 22, 2000 (DI 110); Tr., July 12, 2000 (DI ____), at 2.

**63.** Kurnit Aff. ¶ 2.

**64.** *Id.* ¶¶ 2–4.

### b. The Garbus Affidavit

Mr. Garbus' affidavit claims that he first became aware of the information concerning Paul, Weiss' alleged advice to Warner on DVD matters on July 10 and of the subject addressed by Mr. Kurnit on July 10 or 11. The affidavit denies the allegations regarding his actions in the Black Watch case. And Mr. Garbus there repeats his disavowal of any knowledge of whether the undersigned was involved in the incident involving Mr. Abram.[65]

The other aspect of Mr. Garbus' affidavit was its attachment of an except from a deposition, which is the sole source of his allegations concerning the Paul. Weiss firm's representation of Warner in relation to DVDs.[66] The witness, one King,[67] was shown a memorandum to Stuart Robinowitz from one F. Kandea, dated July 12, 1996, and asked who Mr. Robinowitz is. The transcript proceeds from that point as follows:

"A Stuart Robinowitz at this time was a partner at Paul, Weiss who was advising us on DVD matters. And he is now a senior adviser to Time Warner. He's since retired from Paul, Weiss. And he's a senior adviser to Time Warner.

"Q And what was he advising Time Warner about?

"MR. COOPER: Just subject matter.

"Q Just subject matter, not advice, the subject matter. In the areas of advice, as opposed to the specific advice.

"A He advised us on–first of all, and primarily why we got him involved, was he's an antitrust lawyer. And there were all these meetings of–

"Q Don't tell content, just tell me subject.

"MR. COOPER: Antitrust is sufficient.

"Q There were meetings that involved antitrust issues and you talked to him about–

"A Yes, and he attended some of those meetings.

\* \* \* \* \* \*

"Q Do you know when you first brought him in? Was he someone who was in from the beginning, or did he–

"A He came in very early in our relationship–in our relationship with Toshiba, in Warners' [sic] relationship with Toshiba in the development of DVD.

"Q Would that be early '90s, any vague stab at a date?

---

**65.** Garbus Aff., July 2000 (hereinafter "First Garbus Aff."), ¶ 8.

In one respect, Mr. Garbus' affidavit is inconsistent with his remarks of the preceding day. On July 11, he stated that the incident raised "the possibility of a grievance committee application concerning [his] conduct," but that Morris Abram later told him "that people within his law firm thought that he should have pursued a grievance application against" him. Tr, July 11, 2000 (DI ___), at 3, 4. This of course suggests that no grievance ever was filed. Mr. Garbus' affidavit, in contrast, states: "Morris Abram ... said he was going to file an application with the Disciplinary Committee. I know enough about Morris Abram to know that if he says he will do something, he will do it." First Garbus Aff. ¶ 8.

**66.** First Garbus Aff., Ex. A, at 271–73.

**67.** Defendants' memorandum says that King is an executive vice president of Warner Bros., "one of the named plaintiffs." Def. Mem. 3. Warner Bros., however, is not one of the named plaintiffs. The relevant plaintiff is Time Warner Entertainment Company, L.P. ("TWE"). According to the Form 10–K of Time Warner, Inc. (TWE in turn is a third level subsidiary of Time Warner, Inc.), filed as of March 30, 2000, Warner Bros. is a division of TWE. Time Warner, Inc., Form 10–K, at I–5 (available on SEC EDGAR database). Thus, King is an executive vice president of a division of a plaintiff, not a plaintiff itself. While the distinction between Warner Bros. and TWE makes no difference to the application of the relevant statutes in this case, accuracy is helpful in considering the matter.

"A Well, '93, '94." [68]

Thus, the affidavit Mr. Garbus handed up, insofar as it addresses this point, was at some variance with his oral statements of July 11. The affidavit contains no mention of any legal opinions "apparently at issue here." It contains no suggestion that persons at Paul, Weiss other than Mr. Robinowitz were involved. It makes clear, as the oral statements of July 11 did not, that Mr. Robinowitz was consulted as an antitrust adviser, apparently in connection with meetings concerning Warner's relationship with Toshiba in the development of DVD. It establishes that there is considerable uncertainty as to when Mr. Robinowitz first became involved even in that, a point of some significance in light of the fact that the undersigned retired from Paul, Weiss on August 22, 1994.

### c. Defendants' Oral Application

On July 12, 2000, Mr. Garbus in open court, after handing up the affidavits referred to above, stated, "I will then make a formal motion now pursuant to Section 455 and 144 of the United States Code." The Court responded that the motion should be "done on papers," but if defendants were "going to do it orally, it's denied." It pointed out that "Section 144 requires specifically, among other things, an affidavit, a particular kind of affidavit, and you have clearly not submitted it." [69]

### D. The Present Motion

On July 14, 2000, defendants moved to disqualify the undersigned pursuant to 28 U.S.C. §§ 144, 455(a) and 455(b)(2) and "other relevant sections." The motion is supported by an "affidavit and certification of good faith of Martin Garbus" [70] and Mr.

Kurnit's affidavit. The Kurnit affidavit is the same as that handed up on July 12. The Garbus affidavit, which is dated July 14, 2000, is not. Although it repeats the allegation concerning the Warner issue that had been made previously, on the basis of the same deposition testimony, it adds a copy of the document that the witness was shown at that deposition and an entirely new argument that the Court's alleged bias is evident from its rulings and statements in open court during the course of the case. Mr. Garbus seeks also to justify the failure to raise the Warner issue earlier in part by saying that "I had no foreknowledge of Paul Weiss's involvement . . . with Warner Brothers." [71] As will appear, that statement is proved incorrect by the public record.

It is important to note that defendants' memorandum and Mr. Garbus' affidavit take some liberties with the record concerning the Warner issue. The memorandum claims, without support, that Mr. Robinowitz's advice related to marketing,[72] but that assertion is entirely unsupported and must be disregarded. There is a similar inaccuracy with respect to when his engagement allegedly began. The deposition witness, when invited to take "a vague stab" at the date, said only "Well, '93, '94." Yet Mr. Garbus' affidavit states, without any basis whatever, that it was "early 1993." [73] This of course is relevant to whether the undersigned, who assumed the bench in August 1994, was associated with Mr. Robinowitz when the representation began.[74]

Defendants' assertions regarding the timing of Mr. Robinowitz's consultation by Warner and what "DVD matters" referred

---

68. *Id.*

69. Tr., July 12, 2000 (DI ___), at 3.

70. Garbus Aff., July 14, 2000 (hereinafter "Second Garbus Aff.").

71. *Id.* ¶ 2.

72. Def. Mem. 6.

73. *Id.* Defendants' memorandum also states without qualification that the representation began in 1993. Def. Mem. 3.

74. Defendants' memorandum asserts, also without basis, that "[i]t is also clear that Judge Kaplan was a member of the firm during part of this." *Id.* That too was anything but clear.

to obviously are less than specific. Accordingly, the Court directed Time Warner to address the point. According to a declaration submitted by plaintiffs, Time Warner engaged Paul, Weiss in May 1994 to render antitrust advice to Warner Home Video regarding negotiations between the motion picture, consumer electronics and information technology industries to develop a new voluntary technical standard for optical digital discs. These negotiations, which did not involve copy protection or encryption issues, led to an agreement on a voluntary "DVD" standard in September 1995. Paul, Weiss never has been retained to advise Time Warner concerning copyright or encryption issues with respect to optical digital discs or DVD, nor did it provide any advice on that subject to Time Warner or its affiliates during the tenure of the undersigned with the firm.[75]

## II

Defendants ground their motion to recuse the judge on two separate factual underpinnings. They rely on two different statutes. Each of their factual contentions therefore must be analyzed under both statutes.

### A. Section 144

The first of the two statutes applicable here is Section 144 of the Judicial Code, as amended.[76] which together with its ante-

cedents has existed for many years. It provides:

"Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

"The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith."

The statute therefore has both procedural and substantive requirements.

From a procedural point of view, the affidavit must be timely–it must be filed as soon as practical after learning of the facts.[77] It must be made by the party. And it must be accompanied by a certificate of counsel stating that the affidavit is filed in good faith. The procedural requirements of the statute are enforced strictly.[78]

---

75. Ramos Decl., July 16, 2000, ¶ 3.

76. 28 U.S.C. § 144.

77. *See, e.g., Apple v. Jewish Hosp. and Medical Center*, 829 F.2d 326, 333 (2d Cir.1987) ("It is well-settled that a party must raise its claim of a district court's disqualification at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim."); *Lamborn v. Dittmer*, 726 F.Supp. 510, 514 (S.D.N.Y.1989) (same); *Cranston v. Freeman*, 290 F.Supp. 785, 816 (N.D.N.Y. 1968) (Section 144 motion untimely when brought after commencement of trial), *rev'd on other grounds*, 428 F.2d 822 (2d Cir.1970). The ten day rule stated in the statute no longer is applied literally, as 28 U.S.C. § 138 abolished terms of court. *See* 13A

CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE ("WRIGHT & MILLER") § 3551, at 641 (2d ed.1984).

78. 13A WRIGHT & MILLER § 3542, at 581–84 (1984); *see also, e.g., United States v. Occhipinti*, 851 F.Supp. 523, 525 (S.D.N.Y.1993) (procedures governing timeliness and sufficiency "must be strictly followed and if there is any deviation, the motion should be denied"); *United States v. Johnpoll*, 748 F.Supp. 86, 88 (S.D.N.Y.1990) (same), *aff'd*, 932 F.2d 956 (2d Cir.), *cert. denied*, 502 U.S. 881, 112 S.Ct. 229, 116 L.Ed.2d 185 (1991); *Lamborn v. Dittmer*, 726 F.Supp. 510, 514 (S.D.N.Y. 1989) (same).

From a substantive perspective, the affidavit must allege sufficiently that the judge has a personal bias or prejudice against the party filing the affidavit or in favor of an adverse party. To this must be added the further gloss, viz. that the determination of whether such an affidavit is timely and legally sufficient is made by the judge whose recusal is sought.[79] In doing so, however, the judge is obliged to assume the truth of the factual allegations of the affidavit, although the judge may disregard speculative and conclusory assertions.[80]

### 1. Procedural Deficiency

Section 144 comes into play only when "a party to any proceeding in a district court makes and files a timely and sufficient affidavit" described in the statute. The statute means what it says–the allegation of bias must be made in an affidavit signed by the party, who must attest that the judge harbors a personal bias or prejudice against the party or in favor of an adversary.[81] As noted, its procedural requirements are strictly enforced. And there are sound reasons for this requirement of an affidavit from the party, not the attorney. The decision whether to seek to recuse a judge ought to be made by the person whose interests are at stake in the lawsuit, the litigant. And the decision ought to be based on the party's well founded belief that the party cannot get a fair trial, not counsel's belief that the Court does not think well of counsel.

Here, neither defendant has filed an affidavit. Indeed, neither defendant claims that the Court harbors any bias or prejudice *against it* or in favor of its adversary. The Section 144 motion therefore must be denied on this ground alone. In any case, however, the motion is legally insufficient, even assuming the truth of defendants' factual allegations as distinguished from speculation and conclusions.

### 2. The Allegations Relating to Warner

Section 144, as noted above, requires a showing of "a personal bias or

---

**79.** *See, e.g., Berger v. United States,* 255 U.S. 22, 32, 41 S.Ct. 230, 65 L.Ed. 481 (1921) (it "is imposed upon the judge the duty of examining the affidavit to determine whether or not it is the affidavit specified and required by the statute and to determine its legal sufficiency"); *National Auto Brokers Corp. v. General Motors Corp.,* 572 F.2d 953, 958 (2d Cir.1978) ("a judge has an affirmative duty to inquire into the legal sufficiency of such an affidavit and not to disqualify himself unnecessarily ..."), *cert. denied,* 439 U.S. 1072, 99 S.Ct. 844, 59 L.Ed.2d 38 (1979); *United States v. Haldeman,* 559 F.2d 31, 131 (D.C.Cir.1976) ("It is well settled that the involved judge has the prerogative, if indeed not the duty, of passing on the legal sufficiency of a Section 144 challenge."), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *Eisler v. United States,* 170 F.2d 273, 278 (D.C.Cir.1948) ("[T]he judge has a lawful right to pass on the legal sufficiency of the affidavit."), *cert. granted,* 335 U.S. 857, 69 S.Ct. 130, 93 L.Ed. 404, *cert. dismissed,* 338 U.S. 883, 70 S.Ct. 181, 94 L.Ed. 542 (1949); *American Brake Shoe and Foundry Co. v. Interborough Rapid Transit Co.,* 6 F.Supp. 215, 218 (S.D.N.Y. 1933) ("[W]hen such an affidavit is filed, the recused judge is restricted to a determination of its timeliness and legal sufficiency.").

**80.** *See, e.g., Berger v. United States,* 255 U.S. 22, 35, 41 S.Ct. 230, 65 L.Ed. 481 (1921) (court must assume truth of allegations in the affidavit); *United States v. Vespe,* 868 F.2d 1328, 1340 (3d Cir.1989) (court need not credit speculative and conclusory allegations); *Phillips v. Joint Legislative Committee on Performance and Expenditure Review,* 637 F.2d 1014, 1019 (5th Cir.1981) (court must assume truth of allegations), *cert. denied,* 456 U.S. 960, 102 S.Ct. 2035, 72 L.Ed.2d 483 (1982); *Haldeman,* 559 F.2d at 134 (court may disregard speculative and conclusory allegations).

**81.** *See, e.g., United States ex rel. Wilson v. Coughlin,* 472 F.2d 100, 104 (7th Cir.1973) (motion to disqualify supported by affidavit of one of the attorneys, rather a party, is insufficient); *Giebe v. Pence,* 431 F.2d 942, 943 (9th Cir.1970) (same); *Paschall v. Mayone,* 454 F.Supp. 1289, 1299–1301 (S.D.N.Y.1978) (same). Further, the motion must be sworn to or affirmed by a party to the proceeding, which did not occur here. *See, e.g., Cranston v. Freeman,* 290 F.Supp. 785, 815 (S.D.N.Y. 1968), *rev'd on other grounds,* 428 F.2d 822 (2d Cir.1970).

prejudice either against [the movant] or in favor of any adverse party." The Warner issue concerns whether the judge is disqualified by reason of a relationship, not personal bias or prejudice. Accordingly, Section 144 is irrelevant to that claim,[82] which is governed by Section 455(b)(2).

### 3. The Garbus–Abram Incident

#### a. Timeliness

Before considering the sufficiency of defendants' argument regarding the alleged Garbus–Abram incident, the Court is obliged to consider whether defendants' application in this respect is timely made. As indicated above, this depends upon whether the allegation was made at the "earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim." [83]

Mr. Kurnit, Mr. Garbus' partner, obviously has known the facts set forth in his affidavit, which are assumed true, for nineteen years. Throughout that period, he has been with Mr. Garbus, first as an associate and then as his partner. Thus, at least one partner in the Frankfurt firm knew of the assertions now advanced in February or March, when the firm first was retained.

■ Under standard principles of the law of agency, defendants are charged with knowledge of all facts known to their attorneys that are pertinent to the scope of their engagement.[84] The same principle applies throughout the law of professional ethics. For example, a lawyer is presumed to know any secrets or confidences imparted to others in the lawyer's firm by a former client.[85] Indeed, as defendants stoutly argue here, a judge is disqualified from sitting in a matter on which his former firm was involved during his tenure there,[86] this because the judge is presumed tainted by the knowledge and commitment of his former colleagues, irrespective of whether the judge even knew of the existence of the matter.[87]

■ This principle applies as well to determination of the timeliness of motions for recusal under Section 144. For purposes of timeliness, the applicant is charged with knowledge of all facts "known or knowable, if true, with due diligence from the public record or otherwise." [88] Any other rule would allow a

---

**82.** *See McClelland v. Gronwaldt*, 942 F.Supp. 297, 300–01 (E.D.Tx.1996) (in class action lawsuit concerning improper handling of workers' compensation claims, allegation that judge's former law firm had represented some of plaintiffs concerning workers' compensation claims while judge was a member does not show bias or prejudice to justify disqualification under Section 144); *Duke v. Pfizer, Inc.*, 668 F.Supp. 1031, 1037 (E.D.Mich.1987) (that judge was former client of defendant's counsel's law firm alone is not sufficient to create the appearance of bias or partiality).

**83.** *Apple v. Jewish Hosp. and Med. Ctr.*, 829 F.2d 326, 333 (2d Cir.1987).

**84.** *Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir. 1994) (whether or not defendant actually knew of particular fact giving rise to claim, his attorney plainly had knowledge thereof, and "under traditional principles of agency the attorney's knowledge must be imputed to [defendant]" for purpose of assessing timeliness of claim); *SEC v. H.K. Freeland and Co., Inc.*, 91 Civ. 7986(CSH), 1993 WL 33659, *7 (S.D.N.Y. Feb. 1, 1993) ("It is a basic tenet of

the law of agency that the knowledge of an agent ... is imputed to the principal.... Within the context of that rule, attorneys are regarded as agents for their clients.") (internal quotations omitted).

**85.** *See, e.g., United States v. Lech*, 895 F.Supp. 586, 591 (S.D.N.Y.1995) (ethical rule governing conflicts arising from a firm's representation of parties with adverse interests is based on presumption "that lawyers in the same firm either share or have access to the confidences of all of the firm's clients").

**86.** 28 U.S.C. § 455(b)(2).

**87.** *See* John P. Frank, *Disqualification of Judges: In Support of the Bayh Bill*, 35 J. Law & Contemp. Prob. 41, 49 (1970); John P. Frank, *Disqualification of Judges*, 56 Yale L.J. 605, 622 (1947).

**88.** *Hirschkop v. Virginia State Bar Ass'n*, 406 F.Supp. 721, 724 (E.D.Va.1975). *Accord, United States v. Daley*, 564 F.2d 645, 651 (2d Cir.1977), *cert. denied*, 435 U.S. 933, 98 S.Ct.

member of a law firm aware of facts that might lead to judicial disqualification to sit on the information, wait to see which way the wind appears to be blowing with the judge, and then to come forward in an effort to get rid of the judge if a colleague responsible for a case begins to perceive that the judge is unreceptive to the client's position or even simply wants a delay. Thus, defendants are charged with knowledge of the contents of Mr. Kurnit's affidavit from the moment they engaged the Frankfurt firm in February or March 2000, at least four months ago, irrespective of when Mr. Kurnit first imparted the information to Mr. Garbus. Moreover, this is a singularly appropriate case in which to apply the principle. The case–as well as Mr. Garbus' role in it and the Court's ruling in favor of plaintiffs on the preliminary injunction motion–has received media attention.[89] Defendants' counsel repeatedly have complained of the extensive demands placed on the Frankfurt firm by the expedited schedule here. It is inconceivable that Mr. Kurnit was unaware of the case or the identity of the judge. Hence, even if, as Mr. Garbus claims, Mr. Kurnit did not pass the information along, there is no inequity in concluding that the motion is untimely. And it is interesting, in passing, to note that these allegations concerning the Garbus–Abram incident first were made only weeks after Mr. Abram, evidently the only witness to what-

ever happened between him and Mr. Garbus, passed away.[90]

### b. The Merits

██ Although one might get the impression from reading Mr. Garbus' affidavit that he is accusing the undersigned of having fabricated a false allegation against him, albeit nineteen years ago, that in fact is not the charge. The allegation regarding Mr. Abram's story, stripped to the facts alleged as opposed to the conclusory assertions defendants rest upon, is quite simple. In 1981, Mr. Kurnit told the undersigned that he was going to work at Mr. Garbus' firm. The undersigned told him that Mr. Garbus, at some unknown prior time, "improperly and secretly"[91] had read Mr. Abram's trial notes of a case the two were trying against each other. As Mr. Garbus acknowledges that Mr. Abram had made such an accusation against him, yet does not claim that the undersigned was present when any incident occurred, he acknowledges that any information the undersigned had must have been acquired second-hand.[92] Thus, the only fact that must be assumed true on this motion is that the undersigned, on the basis of hearsay, in 1981 made the statement attributed to him by Mr. Kurnit.[93] Moreover, it did so, as Mr. Kurnit acknowledges, at a time when Mr. Abram

1508, 55 L.Ed.2d 530 (1978) (holding application untimely because, *inter alia,* facts upon which it was based "as a matter of public record, were at all times ascertainable by counsel") (citing *Hirschkop* ); *Huff v. Standard Life Ins. Co.,* 643 F.Supp. 705, 708 (S.D.Fla.1986); *Rademacher v. City of Phoenix,* 442 F.Supp. 27, 29 (D.Ariz.1977); *see also National Auto Brokers Corp.,* 572 F.2d at 958–59 (holding recusal motion based on judge's prior law firm affiliation untimely where the affiliation long had been a matter of public record).

**89.** *E.g.,* Howe Dec. Exs. 2–4, 6 (attached to Village Voice Media Mem. of Law) (DI 185); Garbus Dec. Ex. D (DI 47).

**90.** Mr. Abram died on March 16, 2000. *The New York Times,* Mar. 17, 2000. C19, col. 1.

**91.** If the incident occurred at all, it obviously was not secret.

**92.** As the Court disclosed, it heard such a story 20 or more years ago, probably from Mr. Abram, and has no personal knowledge of the alleged incident.

**93.** Mr. Kurnit does offer a series of self-described assumptions, impressions, understandings and characterizations as well as facts. These are just the sort of statements, the truth of which is not assumed on a motion such as this. *Vespe,* 868 F.2d at 1340 (court need not credit speculative and conclusory allegations); *Haldeman,* 559 F.2d at 134 (court may discredit speculative and conclusory allegations).

was a partner in the firm [94] and thus readily available to Mr. Kurnit had he wished to pursue the matter.

The question, then, is whether the (assumed) fact that a judge, nineteen years earlier while in private practice, repeated an unfavorable second hand story that he had heard about another lawyer to a young associate who planned to accept employment with that other lawyer–in circumstances in which the source of the story, here Mr. Abram, was available to the young associate–establishes that the judge, to quote the statute, now "has a personal bias or prejudice either against [the lawyer's client] or in favor of any adverse party." The answer quite plainly is "no."

The statute explicitly requires a personal bias or prejudice for or against a party, not an attorney. Indeed, it quite carefully distinguishes between required submissions by the party (the affidavit of prejudice) and by its counsel (the certificate of good faith). Moreover, it is well established in the cases and secondary literature, and Congress is presumed to have been aware,[95] that judicial disqualification on the basis of a relationship to a party long was treated differently in many jurisdictions from disqualification based upon a relationship to an attorney.[96] Thus, even if one were to put aside the fact that the Court is bound by the plain language of the statute, which of course cannot properly be put aside,[97] the context of the statute clearly demonstrates that Congress used the word "party" with precision, i.e., to indicate only the litigant and not the litigant's attorney. Accordingly, as the Second Circuit has said, "bias against a lawyer, even if found to exist, without more is not bias against his client." [98] Hence, even a showing of personal bias or prejudice for or against an attorney does not require recusal under Section 144 [99] although, as discussed below, it may be relevant for purposes of Section 455(a).

### B. Section 455

Section 455 of the Judicial Code, insofar as it is relevant here, provides as follows:

"(a) Any ... judge ... of the United States shall disqualify himself in any

94. Kurnit Aff. ¶ 2.

95. *NLRB v. Bildisco and Bildisco,* 465 U.S. 513, 524, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) ("Congress is presumed to be aware of the judicial interpretations of a statute."); *Siebert v. Conservative Party of New York State,* 724 F.2d 334, 337 (2d Cir.1983) (It is a "canon of statutory construction that Congress is presumed to be aware of the judicial background against which it legislates."), *cert. denied,* 466 U.S. 980, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1984).

96. John P. Frank, who has been described as "the leading commentator on the subject" of disqualification of judges, *Laird v. Tatum,* 409 U.S. 824, 829, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972) (Rehnquist, J.) (in chambers), has treated the distinction in two articles, one of which antedates the most recent revision of 28 U.S.C. § 144 in 1948 and 1949. John P. Frank, *Disqualification of Judges: In Support of the Bayh Bill,* 35 J. LAW & CONTEMP. PROB. 41, 46–48 (1970); John P. Frank, *Disqualification of Judges,* 56 YALE L.J. 605, 615–26, 630–36 (1947). *See also* 54 ALR 5th 575 (1997).

97. *United States v. Apfelbaum,* 445 U.S. 115, 121, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980) ("It is a well-established principle of statutory construction that absent clear evidence of a contrary legislative intention, a statute should be interpreted according to its plain language.").

98. *In re Drexel Burnham Lambert Inc.,* 861 F.2d 1307, 1314 (2d Cir.1988), *cert. denied, Milken v. SEC,* 490 U.S. 1102, 109 S.Ct. 2458, 104 L.Ed.2d 1012 (1989).

99. *Gilbert v. City of Little Rock,* 722 F.2d 1390, 1398 (8th Cir.), *cert. denied,* 466 U.S. 972, 104 S.Ct. 2347, 80 L.Ed.2d 820 (1984) (antipathy to attorney insufficient to require disqualification because not indicative of bias against party); *Davis v. Board of Schl. Commissioners,* 517 F.2d 1044, 1050–51 (5th Cir. 1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976); *United States v. Ahmed,* 788 F.Supp. 196, 202 (S.D.N.Y.), *aff'd,* 980 F.2d 161 (2d Cir.1992); *United States v. Int'l Bus. Mach. Corp.,* 475 F.Supp. 1372, 1383 (S.D.N.Y.1979) (same), *aff'd without consideration of the point,* 618 F.2d 923 (2d Cir.1980).

proceeding in which his impartiality might reasonably be questioned.

"(b) He shall also disqualify himself in the following circumstances:

"(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding; [or]

"(2) Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter ...;

"(3) Where he has served in government employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

"(4) He knows that he ... or his spouse or minor child ... has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

"(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person;

"(i) Is a party to the proceeding, or an officer, director or trustee of a party;

"(ii) Is acting as a lawyer in the proceeding;

"(iii) Is known by the judge to have an interest that could be substan-

tially affected by the outcome of the proceeding;

"(iv) Is to the judge's knowledge likely to be a material witness in the proceeding."

And it is important to understand the structure of the statute in its present form, which it took in 1974.

■ Section (b)(2) through (b)(5), most of which have no bearing here, "merely rendered objective and spelled out in detail" grounds which theretofore had contemplated recusal only in the discretion of the judge.[100] Section (b)(1), insofar as it applies to district judges, "entirely duplicated the grounds of recusal set forth in § 144 ... but ... placed the obligation to identify the existence of those grounds upon the judge himself, rather than requiring recusal only in response to a party affidavit."[101] Section 455(a), on the other hand,

"was an entirely new 'catchall' recusal provision, covering both 'interest or relationship' and 'bias or prejudice' grounds, [citation omitted]–but requiring them *all* to be evaluated on an *objective* basis, so that what matters is not the reality of bias or prejudice but its appearance."[102]

With this overview, the Court turns to the specific issues raised by defendants' motion.

*1. Timeliness*

Motions to recuse under Section 455 are subject to the same requirement of timeliness as those under Section 144.[103] Defendants' various allegations require separate consideration from this perspective.

■ The Court has no reason to question the truth of Mr. Garbus' contention that defendants' first learned on July 10

---

**100.** *See Liteky v. United States,* 510 U.S. 540, 547, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).

**101.** *Id.*

**102.** *Id.* (emphasis in original).

**103.** *See, e.g., In re Int'l Business Mach. Corp.,* 618 F.2d 923, 932 (2d Cir.1980) (Section 455 contains timeliness requirement, despite lack of explicit statutory provision); *United States v. Daley,* 564 F.2d 645, 651 (2d Cir.1977) (same), *cert. denied,* 435 U.S. 933, 98 S.Ct. 1508, 55 L.Ed.2d 530 (1978); *United States v. Conforte,* 624 F.2d 869, 880 (9th Cir.), *cert. denied,* 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980).

that Mr. Robinowitz of Paul, Weiss was consulted by Warner on "DVD matters" and that this may have begun during the tenure of the undersigned with the firm. In consequence, that specific contention, which as discussed below is considered under Section 455(b)(2) alone, appears to be timely. To whatever extent defendants properly are understood as suggesting that disqualification is required under Section 455(a) by reason of the fact that Time Warner and it affiliates were clients of Paul, Weiss while the undersigned was with the firm. however, the motion is untimely because that fact was a matter of public record,[104] and the public record demonstrates that Mr. Garbus personally was aware of at least one significant aspect of the relationship despite his demonstrably inaccurate contrary assertion.[105]

**104.** Paul, Weiss' representation Time Warner and one of its two principal predecessors, Warner Communications, is well known and of long standing. A search of the Westlaw ALLCASES database reveals at least 27 reported decisions since 1970 in which Paul, Weiss represented Warner or Time Warner companies. Publications including the *New York Law Journal* repeatedly have referred to the representation, as is confirmed by a similar search.

**105.** Mr. Garbus' affidavit states that he had "no foreknowlege [before July 10] of Paul Weiss's involvement . . . with Warner Brothers." Second Garbus Aff. ¶ 2. In 1996 and 1997, however, Mr. Garbus represented Bloomberg L.P. in litigation against Time Warner. While Time Warner was represented in the lawsuit by the Cravath firm, the district court opinion in that case shows that (a) Allan Arffa, a Paul, Weiss partner, represented Time Warner in the dispute that gave rise to the lawsuit and was involved as Time Warner's counsel in what the district court termed the "critical" meeting, and (b) Mr. Arffa was deposed and submitted an affidavit in support of the preliminary injunction that Mr. Garbus opposed. *Time Warner Cable of New York City v. City of New York,* 943 F.Supp. 1357, 1364–65, 1380–81 (S.D.N.Y. 1996), *aff'd, Time Warner Cable of New York City v. Bloomberg, L.P.,* 118 F.3d 917 (2d Cir.1997).

The Court brought this to the attention of counsel and requested an explanation from Mr. Garbus. Order, July 15, 2000. Mr.

Defendants' contention that the undersigned is disqualified by reason of the alleged remark to Mr. Kurnit is untimely for the reasons discussed above.

*2. Section 455(b)(2)–The Warner Allegation*

■ Defendants' contention that Mr. Robinowitz was consulted by Warner beginning in " '93, '94" as an antitrust lawyer in connection with "DVD matters" first must be considered under Section 455(b)(2).

Section 455(b)(2) requires recusal if, and only if, (1) the judge, while in private practice, or another lawyer in the same firm, (2) during the judge's tenure with the firm, (3) "served . . . as a lawyer concern-

Garbus responded with a declaration stating that "Mr. Arffa's firm is not mentioned in the [district court] Opinion, and 1 do not believe that it was in any way relevant to that case." Garbus Decl., undated, ¶ 1. As noted, however, he was deposed and submitted an affidavit. The very first statement of the affidavit is that Mr. Arffa was a member of Paul, Weiss. Arffa Aff., Oct. 23, 1996, ¶ 1, in *Time Warner Cable of New York City v. City of New York,* No. 96 Civ. 7736(DLC) (S.D.N.Y.) Mr. Garbus signed a stipulation making Mr. Arffa's affidavit part of the record on appeal in that case. Docket Item 61, *Time Warner Cable of New York City, supra.* (Time has not permitted the Court to locate Mr. Arffa's deposition in order to determine its content and Mr. Garbus' role in it.) Mr. Arffa's membership in Paul, Weiss and Paul, Weiss' role as "Time Warner's outside counsel on City franchise matters" was described in the proposed findings and conclusions submitted in the case. Plaintiff's Proposed Findings of Fact and Conclusions of Law ¶ 281, *Time Warner Cable, supra.*

Thus, Mr. Garbus long has been aware that Paul, Weiss is among the law firms used by Time Warner. Moreover, it might be noted that a review of the Martindale–Hubbell listing for and the web site of the Frankfurt, Garbus firm (<http://www.fgks.com /attorney/list.shtml>) shows that at least six of the firm's lawyers–more than 10 percent– are former Paul, Weiss associates. Paul, Weiss' representation of Time Warner and Warner is no surprise to defendants.

ing the matter...." Mr. Robinowitz and the undersigned both were partners at Paul, Weiss until August 22, 1994. Mr. Robinowitz, according to the deposition upon which defendants rely, served as a lawyer to Warner, a plaintiff or an affiliate or predecessor of a party to this case. The questions therefore are whether he did so "concerning the matter" now before the Court and, if so, whether that occurred during the tenure of the undersigned at Paul, Weiss.[106] Quite plainly he did not.

Defendants' argument is a straightforward syllogism. Mr. Robinowitz was engaged as antitrust counsel concerning "DVD matters." This case relates to DVDs. *Ergo*, a lawyer with whom the undersigned practiced served as counsel "concerning the matter." It is also patently wrong, no matter what view one takes of the construction of that statutory phrase.

Some courts have held that "the matter," as the phrase is used in Section 455(b)(2), is the particular lawsuit before the judge whose recusal is sought.[107] There is practical appeal to that position. As the Supreme Court has pointed out in another context, at a sufficiently high level of generality, everything is related to everything else.[108] Thus, as Judge Posner suggested in *Schurz Communications, Inc. v. FCC*,[109] if "the matter" were defined by characterizing types or subject matters of professional engagements–such as insurance matters, personal injury matters,

"DVD matters," and so on–judges would be "eternally disqualified" from sitting in whole categories of cases.[110] And while the Court recognizes that there are levels of generality between defining "the matter" that broadly and limiting it to the case before the judge, the statute provides no standard by which selection of the appropriate level of generality is to be made beyond, perhaps, the common sense extrapolation that a lawyer consulted with a view toward a particular litigation is retained "concerning the matter" even before the complaint is filed.[111] Certainly if these considerations warrant the conclusion reached by some courts that "the matter" properly is confined to the specific lawsuit before the judge, this aspect of defendants' motion must be denied. But it is not necessary to decide the motion on this ground.

The fundamental issues in this case are whether DeCSS, which was developed in late 1999, violates the DMCA, which was adopted in 1998, by circumventing CSS, which first was licensed in late 1996, and if so whether the DMCA is constitutional. Based on the information submitted by defendants, it would be impossible to conclude that the unspecified "DVD matters" on which Mr. Robinowitz was consulted as antitrust counsel had any reasonable relationship to the questions presented in this lawsuit. As defendants themselves concede, he first was consulted "when DVD

**106.** In the interests of complete disclosure, the undersigned notes that he from time to time performed services for Warner companies while in private practice. Nothing the undersigned worked on had the slightest relationship to this case. Since none concerned the matter here at issue, this fact is immaterial here.

**107.** *See, e.g., Patterson v. Masem,* 774 F.2d 251, 254 n. 2 (8th Cir.1985); *see Schurz Comm., Inc. v. FCC,* 982 F.2d 1057, 1061 (7th Cir.1992) (Posner, J.) (in chambers).

**108.** *See Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (in order to defeat qualified immunity defense to § 1983 claim, plaintiff must show that de-

fendant unreasonably violated clearly established legal rule; legal rule must be defined in specific terms in order to avoid transforming doctrine of qualified immunity into basis for unqualified liability by generality of characterizations of constitutional rights).

**109.** *Schurz Commun., Inc.,* 982 F.2d at 1059–61.

**110.** *Id.; see also Rios v. Enterprise Ass'n Steamfitters Local 638,* 860 F.2d 1168, 1172 (2d Cir.1988).

**111.** *See, e.g.,* 13A WRIGHT & MILLER § 3544, at 588; Note, *Disqualification of Judges and Justices in the Federal Courts,* 86 HARV. L.REV. 736, 760 (1973).

technology was in its infancy and prior to being brought to market."[112] The DMCA did not exist. DeCSS did not exist. It is not even clear that CSS existed, although one reasonably might suppose that the motion picture studios contemplated some form of copy protection before they started making and selling DVDs in late 1996. Surely Mr. Robinowitz was not in a position, prior to August 1994 when the undersigned left the firm, to have learned anything about, or even to have formed a view, on any of the issues that now confront the Court. And this is confirmed by plaintiffs' submission, which makes perfectly clear that the engagement to which the witness referred in the deposition had nothing whatever to do with the issues in this case.[113]

To be sure, Mr. Garbus' affidavit offers us his belief "that encrypting a DVD product that could only be played on qualified machines was the antitrust issue" on which Mr. Robinowitz advised Warner.[114] But Mr. Garbus' belief is no substitute for evidence. Indeed, elsewhere in his papers, he contends–equally without support–that Mr. Robinowitz advised the company on marketing.[115] And even assuming that his speculation were correct, his assertion that the advice was "concerning the matter" is wrong. The fundamental issue in this case is whether distribution of DeCSS violates the DMCA by providing a means of circumventing CSS. The question whether defendants' actions in making the technology necessary to manufacture equipment capable of playing their DVDs available

only to those who license that technology is consistent with the antitrust laws simply is not at issue here. It is another matter entirely. And in any case, it is not the matter on which Mr. Robinowitz was consulted in May 1994.

### 3. Section 455(b)(1)–The Garbus–Abram Incident

 Section 455(b)(1) requires a personal bias or prejudice against a party or in favor of the party's adversary. It is coextensive with Section 144.[116] In consequence, insofar as defendants' motion relies upon Section 455(b)(1), it is denied for the same substantive reasons as its Section 144 motion.

### 4. Section 455(a)

There is little to be said concerning the Warner matter for Section 455(a) purposes. In *Liteky*, the Supreme Court explained the relationship between Sections 455(a) and (b) by stating that it would be "unreasonable to interpret § 455(a) (unless the language *requires* it) as implicitly eliminating a limitation explicitly set forth in § 455(b)."[117] To do otherwise, it held, would "cause the statute, in a significant sense, to contradict itself."[118] It would be wrong, for example, to disqualify a judge under Section 455(a) because of a fourth degree relationship to a party, given Section 455(b)(5)'s requirement of disqualification based on a third degree or closer

---

**112.** Def. Mem. 3.

**113.** Ramos Decl., July 16, 2000, ¶ 3. Indeed, the document that the witness was shown related not to any Paul, Weiss representation of Warner, but rather to a representation of Toshiba Corp. that began in 1996. *See id.* ¶ 4.

**114.** Second Garbus Aff. ¶ 3.

**115.** Def. Mem. 6.

**116.** *Liteky*, 510 U.S. at 548, 114 S.Ct. 1147 (§ 455(b)(1) "entirely duplicated the grounds of recusal set forth in § 144"). *Liteky* points

out that, unlike Section 144, Section 455(b)(1) is applicable to all justices, judges, and magistrates and places the obligation to identify the existence of grounds for recusal upon the judge himself, rather than requiring a party affidavit. *Id. See also Apple v. Jewish Hosp. and Medical Ctr.*, 829 F.2d 326, 333 (2d Cir. 1987) ("the substantive standards of §§ 144 and 455(b)(1) ... are to be construed in *pari materia*").

**117.** *Liteky*, 510 U.S. at 553, 114 S.Ct. 1147 (emphasis in original).

**118.** *Id.* at 552, 114 S.Ct. 1147.

relationship.[119] Congress drew the line at the third degree. Similarly, the "extrajudicial source limitation" contained in Section 455(b)(1) necessarily applies to Section 455(a), although the latter section does not explicitly contain this limitation.[120] By parity of reasoning, it would be equally wrong to disqualify a judge under Section 455(a) based on a prior professional association with a lawyer who previously represented a party either where (1) the representation occurred after the judge left the association or (b) the representation did not concern the matter in controversy. In other words, the limitations in Section 455(b)(2)–that disqualification is warranted only where the judge, while a lawyer in private practice, represented or practiced with a lawyer who represented a client concerning the matter in controversy–constrain Section 455(a).

▆ The Garbus–Abram incident, in contrast, is subject to analysis under Section 455(a). Indeed, although they are rare, circumstances do exist where personal bias or prejudice against an attorney, as opposed to the attorney's client, may rise to such a level as to create a genuine issue as to the judge's ability to render impartial justice to the client.[121] But disqualification on that ground would be inappropriate here.

To begin with, the argument is untimely. Mr. Kurnit, at least, knew all of the facts now relied upon for nineteen years and knew them for four or five months after Mr. Garbus entered the case and before the motion was made. That is fatal to defendants' argument for the same reasons as under Section 144.

So far as the merits are concerned, the question is whether one knowing all of the facts reasonably would conclude that there is an appearance of impropriety.[122] The facts here include at least the following. There is no suggestion that the undersigned and Mr. Garbus ever have had any contact, professional or social, outside of Mr. Garbus' appearance in this action. The underlying Abram–Garbus incident, whatever it was, occurred more than nineteen years ago, perhaps considerably more. The undersigned had no personal knowledge of the facts, whatever they were, and no involvement in the case in which the incident, whatever it was, occurred.[123] He allegedly repeated the hearsay story to Mr. Kurnit in circumstances

**119.** *Id.* at 553, 114 S.Ct. 1147.

**120.** *Id.*

**121.** *United States v. Jacobs*, 855 F.2d 652, 656 n. 2 (9th Cir.1988) (Sections 455 and 144 "require such virulent personal bias or prejudice against the attorney as to amount to a bias against the party."); *Gilbert v. City of Little Rock*, 722 F.2d 1390, 1399 (8th Cir. 1983) (same); *Davis v. Board of Schl. Commissioners*, 517 F.2d 1044, 1050–51 (5th Cir. 1975), *cert. denied*, 425 U.S. 94, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976); *United States v. Oluwafemi*, 883 F.Supp. 885, 891 (S.D.N.Y.1995) (same); *United States v. Ahmed*, 788 F.Supp. 196, 203 (S.D.N.Y.) ("[t]he hostility or bias must be so virulent and of such magnitude that it prejudices the judge against the attorney's client"), *aff'd*, 980 F.2d 161 (2d Cir. 1992). In none of these cases was the controversy between the judge and the attorney found to be so virulent as to prejudice the judge against the attorney's client and therefore constitute ground for disqualification.

**122.** *See, e.g., In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307, 1309 (2d Cir.1988) ("[T]he test of impartiality is what a reasonable person, knowing and understanding all the facts and circumstances, would believe."), *reh'g denied*, 869 F.2d 116 (2d Cir.), *cert. denied*, 490 U.S. 1102, 109 S.Ct. 2458, 104 L.Ed.2d 1012 (1989).

**123.** *See, e.g., Parker v. Connors Steel Co.*, 855 F.2d 1510, 1525 n. 16 (11th Cir.1988) (under Section 455, court is not bound by the allegations in the affidavits), *cert. denied*, 490 U.S. 1066, 109 S.Ct. 2066, 104 L.Ed.2d 631 (1989); *Phillips v. Joint Legislative Committee on Performance and Expenditure Review of Mississippi*, 637 F.2d 1014, 1019 n. 6 (5th Cir.), *cert. denied*, 456 U.S. 960, 102 S.Ct. 2035, 72 L.Ed.2d 483 (1982); *United States v. Agunbiade*, No. 90–CR–612(S)–02(JRB), 1995 WL 351058, *12 (E.D.N.Y.1995), *aff'd*, 100 F.3d 942, 1996 WL 20514 (2d Cir.1996); *Farkas v. Ellis*, 768 F.Supp. 476, 480 (S.D.N.Y. 1991); *Lamborn v. Dittmer*, 726 F.Supp. 510, 517 (S.D.N.Y.1989).

in which the source, Mr. Abram, was readily available to Mr. Kurnit if he wished further information. Whatever may have been said to Mr. Kurnit many years ago quite obviously did not discourage Mr. Kurnit from joining Mr. Garbus' firm. In the intervening years, Mr. Garbus never was disciplined or, indeed, charged by any official body. The suggestion of personal bias even against Mr. Garbus in these circumstances is more than a stretch. And there is not the slightest suggestion that the Court has any bias or prejudice against Mr. Garbus' clients. The assertion that a reasonable person, knowing all the facts, would "entertain significant doubt that justice would be done absent recusal" [124] by virtue of this ancient event, with due respect, simply reflects unduly zealous advocacy and pique.

 Finally, defendants seek to buttress their other arguments by complaining of virtually everything that has not gone their way in this case and suggesting that these rulings have been the product of bias against Mr. Garbus. But the contention is very wide of the mark, whether the rulings are considered in isolation or in combination with defendants' other complaints.

First of all, defendants utterly ignore the fact that, from the moment Mr. Garbus entered the case, they rather than plaintiffs have prevailed on many of the significant issues upon which the Court has ruled. Without attempting to be encyclopedic, the Court notes the following:

· Plaintiffs moved to stay all discovery pending determination of their motion to disqualify Mr. Garbus and his firm based on its simultaneous representation of Time Warner. The Court denied their motion, except as to Time Warner.[125]

· The Court insisted that MPAA bring its West Coast witnesses to New York for depositions, in order to convenience defendants' counsel,[126] despite the fact that the MPAA, as a non-party witness, probably had the right to insist on those witnesses being deposed in California.[127]

· Plaintiffs moved to disqualify Mr. Garbus and his firm. The Court denied the motion, in part on the basis that Time Warner was seeking tactical advantage by making it and in part on the ground that disqualifying Mr. Garbus and his firm would prejudice defendants unduly.[128]

· Plaintiffs sought to preclude defendants from taking the deposition of Disney's Michael Eisner. The Court denied the application.[129]

· Plaintiffs sought to preclude defendants from posting transcripts of depositions of plaintiffs' personnel on the Internet. The Court declined to do so.[130]

· Defendants complained that plaintiffs had abused the attorney-client privilege to withhold thousands of documents. The Court worked out an arrangement pursuant to which plaintiffs made the

---

**124.** *United States v. Bayless,* 201 F.3d 116, 126 (2d Cir.2000) (quoting *Diamondstone v. Macaluso,* 148 F.3d 113, 120–21 (2d Cir. 1998)) (quoting *United States v. Lovaglia,* 954 F.2d 811, 815 (2d Cir.1992)).

**125.** Tr., May 2, 2000 (DI 122), at 21–23.

**126.** Tr., May 11, 2000 (DI 126), at 36.

**127.** *See, e.g., Devlin v. Transp. Communications Int'l Union,* Nos. 95 Civ. 0752, 95 Civ. 10838(JFK), 2000 WL 28173, *3 (S.D.N.Y. Jan. 14, 2000) ("As a general matter, there is a presumption that a defendant or non-party witness shall be deposed in the district where

the deponent resides or has a principal place of business."); *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.,* 171 F.R.D. 135, 155 (S.D.N.Y.1997) ("There is a general presumption that a non-resident defendant's deposition will be held where he or she resides or works.").

**128.** *Universal III,* 98 F.Supp.2d at 455–56.

**129.** Tr., June 27, 2000 (DI ____), at 42–43.

**130.** Tr., June 6, 2000 (DI 140), at 60–61.

vast bulk of the documents available to defendants pursuant to a no-waiver agreement, with issues of privilege and therefore admissibility reserved pending trial.[131]

Second, defendants' complaints about undue time pressure are objectively meritless. Both sides have labored under precisely the same constraints. More important, defendants ignore the two principal sources of their problem: their own inactivity until late in the day and the fact that their dissatisfaction with the schedule derives from a view of the case on their part that simply does not square with the Court's assessment of the issues genuinely involved. As to the second, they have been intent upon exploring–in their words–"what the plaintiffs knew (and know) about the actual risk of 'piracy' posed by DeCSS, when they gained this knowledge, what they did to gain it, and what they did to eradicate the alleged risk...." [132] But as the Court repeatedly has made clear to defendants, most recently in its June 27 bench opinion, it regards those matters as essentially irrelevant to the disposition of this case.[133] Defendants have made no persuasive effort to show that the Court is mistaken.[134] Yet most of defendants' discovery appears to have been directed at those matters, notwithstanding the Court's rulings. If the Court is mistaken in its assessment of the proper scope of the case, the issue is appropriately dealt with on direct appeal from a final judgment. But defendants cannot simply ignore Court's view, claim that there is not enough time in which to do discovery that the Court has indicated is not relevant, and then contend that they have been pressed unduly quickly to trial.

Third, Mr. Garbus complains that he has been humiliated and threatened, referring to the Court's observations concerning publicity seeking efforts by his client and himself and, presumably, to the statement in the opinion refusing to disqualify Mr. Garbus that the issue was more appropriately a subject for the professional disciplinary bodies.[135] But the Court has expressed disapproval of both sides' publicity-seeking efforts,[136] and those of Mr. Garbus and his clients in fact have been both conspicuous and suggestive of a motive for certain of the discovery abuses that have occurred.[137] In suggesting that the question whether defendants' counsel should be sanctioned for having persisted in the representation of these defendants while at the same time representing Time Warner in another case, and then trying to drop Time Warner to eliminate the patent conflict of interest, the Court did no more than reiterate what the Second Circuit in recent years repeatedly has stated: except in rare cases, ethical issues regarding attorneys are properly dealt with in professional disciplinary bodies rather than by motions to disqualify counsel, which are subject to abuse,[138] as indeed

131. Order, July 11, 2000 (DI 127); Order (Corrected), July 12, 2000 (DI ___).

132. Letter, E. Hernstadt to Court, June 27, 2000 (DI 152), at 2.

133. Tr., June 27, 2000 (DI ___), at 33–35, 38, 49–50.

134. *See, e.g.*, Tr., June 27, 2000 (DI ___), at 47.

135. Second Garbus Aff. ¶¶ 13–15.

136. Tr., June 6, 2000 (DI 140), at 67; Tr., June 27, 2000 (DI ___), at 38–40.

137. *See, e.g.*, Meislin Aff. (DI 61 Exhibit); Tr., June 27, 2000 (DI ___), at 38–41; *see also*

*Martin Garbus–The DVD Case* (visited July 16, 2000) <http://www.fgks.com/mar tygar bus/garbus_dvd.shtml>.

138. *See, e.g.*, *Armstrong v. McAlpin*, 625 F.2d 433, 446 (2d Cir.1980) ("[P]ossible ethical conflicts surfacing during a litigation are generally better addressed by the comprehensive disciplinary machinery of the state and federal bar.") (quotations omitted), *vacated on other grounds*, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981); *W.T. Grant Co. v. Haines*, 531 F.2d 671, 677 (2d Cir.1976) (If counsel "is guilty of professional misconduct ... the appropriate forum is the Grievance Committee of the bar association.") (quotations omitted); *Harker v. Commissioner of Internal Revenue*, 82 F.3d 806, 808 (8th Cir.

the Court found was the case here.[139]

As the Supreme Court said in *Liteky:*

"[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion. [citation omitted] In and of themselves (*i.e.,* apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal. Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings ... do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks ... that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.' * * * A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." [140]

The Court's rulings and comments, it is submitted, do not even remotely approach the level warranting recusal, as a review of the transcripts and opinions shows. And although the Court recognizes that defendants will claim that *Liteky* does not apply because the undersigned's alleged comment to Mr. Kurnit nineteen years ago reflects an extrajudicial source of bias, the Court disagrees for all of the reasons above. The comment simply is not probative of any present bias or prejudice against Mr. Garbus, much less his clients, and none exists.

### III

The Court concludes where it began. It has considered carefully whether it is obliged to recuse itself. Having concluded that the law does not so require, the motion is denied. Defendants cannot be permitted to parlay a baseless attack on the judge into the delay they seek. Nor are they entitled to use such an attack in an effort to avoid a judge before whom, for whatever reason, they would prefer not to proceed.

SO ORDERED.

### ORDER

Defendants' previously moved to recuse the undersigned pursuant to 28 U.S.C. § 144 and 28 U.S.C. § 455(a) and (b)(2) and "other relevant sections." In an opinion dated July 17, 2000, the Court denied the motion.

The Court recognizes that it has an independent obligation under 28 U.S.C. § 455 to recuse itself if facts so requiring come to its attention. Testimony was received during the trial today bearing on

---

1996) ("Because of the potential for abuse by opposing counsel, disqualification motions should be subjected to particularly strict judicial scrutiny.") (internal quotations omitted); *Optyl Eyewear Fashion Int'l Corp. v. Style Cos.,* 760 F.2d 1045, 1050 (9th Cir.1985) (same); *Rice v. Baron,* 456 F.Supp. 1361, 1370 (S.D.N.Y.1978) (same); *Healy v. Axelrod Const. Co. Defined Benefit Pension Plan and Trust,* 155 F.R.D. 615, 622 (N.D.Ill.1994) (pointing out "potential for abuse of disqualification motions as a harassing or delaying tactic"); *Bowman v. Bank of Delaware,* No.

87–44–CMW, 1988 WL 54669, *3 (D.Del. May 24, 1988) ("Motions to disqualify are subject to abuse because they can greatly delay an action and can cause great expense and inconvenience to a client whose counsel has been disqualified.").

**139.** *Universal III,* 98 F.Supp.2d at 456.

**140.** *Liteky,* 510 U.S. at 555–56, 114 S.Ct. 1147 (emphasis in original).

the question whether a lawyer with whom the undersigned previously practiced, during the period in which the Court practiced with him, represented a party "concerning the matter." *See* 28 U.S.C. § 455(b)(2). The Court therefore has reconsidered the matter in light of that testimony.

The witness, Ms. King of Warner Home Video, testified in substance that the subject of encryption and security of digital files on DVDs did not arise at Warner Home Video until 1995 and that Warner was not working on encryption prior to January 1, 1995. In consequence, as the Court concluded on the basis of the evidence previously before it, even if the Court's former law partner worked on such issues for Warner, and the evidence submitted to the Court is that he did not, there would be no basis for concluding that he did so during the period in which the Court practiced with him. Relevant transcript pages, printed from the *draft* real-time transcript, are attached to this order.

On reconsideration in light of this further evidence, the Court again concludes that recusal on this basis is not required under 28 U.S.C. § 455.

SO ORDERED.

## ATTACHMENT

## CROSS–EXAMINATION Continued

MR. GARBUS:

MR. GARBUS:

Q. Ms. King, I'm TKPWREG to try and pick up where Mr. Gold began examination and I'll try and do it quickly so we can finish before lunch. When did you start at Warner Home Video?

A. Beginning of March 1990.

Q. And when did you start begin working on DVD?

A. We didn't call it DVD, but I did some work on that during the year 1990.

Q. What did you then call it?

A. We called it movie on a TKPEUFBG.

Q. And at some point does that get called DVD or whatever there predecessor was?

A. Then it was called TAZ and then it was called DVD.

Q. And about when was it called DVD?

A. '96, it had been called S–D D as well.

Q. And at the very beginning of these conversations, was there a concern about a security system for whatever was called that was going to be released the movie on a disk?

A. Well, when it was just an idea there wasn't a security system.

Q. When did it go beyond being just an idea?

A. Well, when it was coming into being reality and the studio started meeting we talked about a security system. I believe that was around 1995.

Q. So that the first time?

MR. GOLD: Your Honor, if I may this line of questioning that goes back in time, back before 1996 when this was released and on into the early '90s hasn't got any relevance to this case whatsoever.

THE COURT: Well look, you know why Mr. Garbus wants to go into it and Mr. Garbus knows why he wants to go into it and it hasn't got much to do with the issues in the case and I know why he wants to go into it he's trying to do some discovery for another purpose.

MR GOLD: Yes, your Honor.

MR. GARBUS: No, I'm not, I'll skip it that's not the point.

THE COURT: Pardon me.

MR. GARBUS: That's absolutely not the point and I'll skip it, I'll STARBTD with 1996 there has nothing to do I see what's implied and I has nothing to do with that at all, I don't know when it started, I don't know when they thought of security systems.

THE COURT: Mr. Garbus relax there was something else I was going to say on that subject but in light of your represen-

tation that that's not what it's all about annual skip it I'll accept the represent station that we'll go on.

Q. Now?

A.

THE COURT:

THE COURT: If you want to press it then we'll deal with it.

Q. Now, when you started working on what we call DVD, let's say 1995 and don't tell me anything about before 1995, was that when the name DVD first came in or was it '96?

A. I can't exactly remember when the name DVD came in. The 2 competing optical disk formats were converged I believe in September of '95. DVD as a name since there was a consequence verge SKWREPBS of 2 standards 1 called S D and 1 called M M CD came in after that. So it was either late '95 or early '96.

Q. And when for the first time after January 1, 1995 did they start discussing encryption systems or security systems?

A. I can't—I can't remember the initial date and I've been given nothing to refresh my memory I couldn't find it sometime of I'm sure in my files, but around that time in '95, the motion picture companies started discussing legislation originally it was a HREFPSZ HRAEUF proposal between consumer electronics and the motion picture industry to protect their product in the digital domain.

Q. And tell me just a little about those conversations?

A. Those conversations were originally we looked at the audio home recording rights act where they had a bit extreme where *E which had to be recognized WRERP looking at HREFPS STRAEUGS similar to that however you wouldn't be able to make a copy as you are under the recording home rights ago the issue was do we need the KPHAOEURTer industry in there room we certainly at

Warner said we did, other studios said we did, did you say flow included when we finally came up with some proposed legislation and brought the I T industry into the room, we stopped the legislation and sat down and started from scratch on a new security idea that that would be acceptable by the computer industry along with a new type of legislation to protect us.

Q. And the people?

THE COURT:

THE COURT: Excuse me a minute, Mr. Garbus, are you able to say from your own knowledge whether Warner was working on Eng KREUPGS prior to January of 1995.

THE WITNESS: No, we weren't.

THE COURT: Proceed.

Q. Now, with respect to instead of en KREUPBGS, how about the word since the judge asked the question how about security system, was there any concern prior to '95 expressed about security for the videos—pardon me, URBGS for the movie that is were could be released?

A. I don't remember that being a topic that I participated in.

Q. You say you don't RAEB being a topic that you participated?

A. Western try to go come up—we had a certain window of opportunity we felt in the video industry at least at Warner Brothers and we were part—we were a large part of the development of DVD. We wanted to get this hard copy consumer product into the market before high definition television and before video on demand was widely available. We want to do get consumer acceptance and we knew we had a limited window of opportunity. So before you can think about security you have to think about having a product and we were I am percented in developing the product.

Q. Now, one of the issues with the A H R A down what there standing for?

A. The audio home recording rights act.

Q. Yes and that's 1992?

A. I don't know the date.

Q. One of the issues there was the question of security for audio recordings, is that right?

A. That's how I understand it.

Q. So everybody understood after 1992 that you had to have some kind of security system for any product that was released into the market?

A. That's right.

MR. GOLD:

MR. GOLD: I object to the fortunately of the the question your Honor.

THE COURT: Yes, look, this is now enough, Mr. Garbus, I have an affirmative obligation that I recognize as far as I'm concerned, I have discharged it, you can now proceed and handle this case.

MR. GARBUS: Thank you.

Q. Now,

MR. GARBUS: Can we just approach the bench for a moment, your Honor?

THE COURT: I'm sorry?

MR. GARBUS: Can we approach the bench for a moment?

THE COURT: Yes.

MR. GARBUS: I'm not STKPWOELG to pursue this HREUPB of inquiry any further. It seems perfectly obvious to me that even before the audio home recording act of 1992 that any one who was thinking of releasing any product into the consumer market was extraordinarily concerned about security. What this witness has just answered is and I don't remember letter question and answer, that you were not going to have a product released, she just gave a yes to my last question I'm not going to state it here and AOEUP not going to go any further with it, but it's inconceivable to me—I won't say what's inconceivable to me.

MR. GOLD: Your Honor, the witness has testified that Warner will played the decision that they were not going to release DVDs unless there was an encryption system that they felt good about. She also testified that at the meeting she went to in the industry she heard and knew that the other studios felt the same way.

THE COURT: Look, I don't have to hear all of that. This is exceptionally simple. The only reason I raise the question is because quite apart from what the parties have raised I have an independent obligation under section 455 B–2 of the code to TKEUS KW–L my myself if it appears that someone with whom I practiced law at the time I did so was engaged by a party "concerning the matter."

It is a subject? The context of this case on which I have no knowledge of my own, I am entirely at the mercy of what the parties put before me. I don't know there I had an obligation tending so far as to ask the question there I did but I now have before me the witness' deposition testimony. I have what she said here. I have the affidavits that were put before me on the motion. And the issue is as far as I'm concerned closed absent new evidence. I do not view this trial as a discovery proceeding for the purpose of conducting an expedition in search of that new evidence. Obviously if there is such evidence and it requires my disqualification, I will readily do so. But I haven't seen it and what we are here to try now is this case.

MR. GARBUS: So can I understand something? So then I should not continue the line of questioning leading from the A H R A of '92 up to '95 and '96?

THE COURT: I can't make abstract rulings like there. I believe there I said in my opinion, Mr. Garbus, that I reasonably might infer although I don't have the text in front of me, that somebody probably thought about security at some earlier point, but somebody thinking about security and my partner former partner having been engaged with respect to security, if indeed that would be enough which I ex-

press no view on right now, in the period between August—prior to August 22, 1994 is a hole other matter.

MR. GARBUS: Thank you (in open court)